We will hear argument this morning in Case 23-1300 Nuclear Regulatory Commission v. Texas and the Consolidated Case. Mr. Stewart? Thank you, Mr. Chief Justice, and may it please the Court. First, the petitions for review should be dismissed because neither Texas nor FASCN was a party to the NRC licensing proceedings. Texas did not try to intervene in the agency adjudication. FASCN moved to intervene, but its request was denied and the D.C. Circuit affirmed the denial. And there is no sound basis for the Fifth Circuit's ultra-virus exception to the Hobbs Act's party-agreed requirement. If the Court reaches the merits, it should reverse the Court of Appeals judgment. The Atomic Energy Act prohibits the unlicensed possession of spent nuclear fuels' constituent parts while authorizing the Commission to license private interim storage of those substances. The Nuclear Waste Policy Act left that scheme intact. And since 1980, the NRC's regulations have provided for both on-site and off-site storage. That system allows a substantial role for private market responses to the country's nuclear waste storage issues, subject to Commission oversight to ensure that storage is safe and consistent with statutory requirements. I welcome the Court's questions. Mr. Stewart, what does it take to be a party in these proceedings? In an adjudication, you would need to intervene, and the Commission's rules set out the process for intervention. So when can an interested person intervene? The Commission's rules set out two requirements. One is basically a standing requirement, and that is essentially that you be an interested person, that your interests be affected by the outcome. And second, the Commission's rules require what's called an admissible contention, and the rules were changed in 1990. The changes were upheld by the D.C. Circuit, and basically the problem the Commission had confronted was that it would get requests to intervene accompanied by very vague assertions. So aside from the substance, when can you intervene? When can an interested person intervene? Essentially, the Commission will issue notice that a licensing proceeding is underway or will soon be underway, and then it will give a certain amount of time for remarks. How much time? I think it was 60 or 90 days to give notice of your intent to intervene, and then there were written submissions. The Atomic Safety and Licensing Board passed in the first instance on various requests to intervene, and then there was an appeal available to the full Commission, and then FASCN sought judicial review of the Commission's denial of its request to intervene. The regulation that you cited, how is that supported by the statutory language? The D.C. Circuit in the case Union of Concerned Scientists that I referred to a moment ago, I think it's a 920F2nd, said that this was an aspect of agencies' traditional broad authority to regulate their own procedures. It seems to go beyond the statutory language itself. Is that correct? Do you agree with that? I agree that the statutory language in itself would not impose this requirement, and the Commission's prior rules had not done so. In looking at the statutory language, Mr. Stewart, it says that any person who requests a hearing and their interests are affected shall be admitted. That's a mandatory obligation, as I read it, and FASCN, their interest is affected and they've requested a hearing. Those things are undisputed, right? Yes. So help me with Justice Kagan's question. The two things I would say were, first, when FASCN appealed to the D.C. Circuit from the denial of its request to intervene, it didn't make the argument that the Commission's rules were invalid or it had a statutory right to intervene. It said it had a statutory right to intervene, and I read the D.C. Circuit opinion. It didn't address that argument at all. It has said that it has a right to intervene, but it was asserting that right under the Commission's own rules. And I guess the second thing I would say is, at most, the argument you're suggesting would imply that FASCN ought to have been allowed to intervene. It ought to have been made a party. But the fact is, it wasn't... You could have thought it was futile, given the D.C. Circuit precedent on the question, yes? Well, it could have thought... The arguments that FASCN made were actually that it was entitled to intervene under the Commission's own rules. It was not arguing that the rules imposed an invalid extra-statutory requirement. So it had no reason to think that that was invalid. Actually, I've got it before me, and it says that they are entitled... NRC abused its discretion, acted arbitrarily and capriciously in an excess of statutory jurisdiction by not admitting them. And it goes on to talk about the policies and regulations, but it cites the statute in its petition for review. And again, the D.C. Circuit didn't address it. I guess the other thing I'd say is, they could have sought en banc review. They could have sought certiorari review. And what they are, in essence, doing... Is your argument essentially one from issue preclusion, then? Is that the nature of your argument? That that was litigated in another form, and therefore they're bound by it? I think yes, in the sense that... Okay. If it is issue preclusion, then, you didn't argue issue preclusion below. Well, what we have... You haven't argued it here. We have not put the issue preclusion label on it. We did say in our reply brief they can't collaterally attack the D.C. Circuit's decision upholding the denial of intervention. But isn't it your burden to show that issue preclusion applies? I mean, I think it would be our... Isn't it normally the case that the party seeking issue preclusion has to bear the burden of proving it? I think what they have... Our focus has always been on the fact that they did not, in fact, become parties. And FASCN has never contested that. Can you answer my question, though? The party seeking issue preclusion bears the burden of proving it. Yes, typically so. Mr. Stewart, can you explain this issue preclusion? What is your understanding of Justice Gorsuch's question? Because I'm not sure I see it as issue preclusion. So help me to figure that out. Well, I think the question... If the question is... First, our position would be the question should be, did FASCN, in fact, intervene in the proceedings and become a party? And it didn't. But even if the question is, should FASCN have been allowed to intervene? Did FASCN... Was FASCN improperly denied a right to intervene that it had under the statute? The D.C. Circuit resolved that issue against it. And it didn't seek direct review of that determination, either before the en banc D.C. Circuit or before this court. And I guess for us to consider that to be issue preclusion that has some bearing on this proceeding, we would be suggesting that a party could make some sort of a collateral challenge to their party status through this route. In other words, you're saying procedurally the D.C. Circuit made a ruling about whether or not FASCN was entitled to intervene. They, FASCN, did not seek rehearing en banc, did not seek cert. But I suppose to the extent now that we are considering their party status, I guess there's a suggestion that maybe they should be able to raise that issue in this proceeding? Yes, and I think that's not the way it would work in district court litigation. For instance, if a party moved to intervene in a district court proceeding and was denied intervention, if it wanted to become a party, it would need to appeal from the denial of intervention. And if it appealed from the denial of intervention and lost again in the court of appeals, it couldn't simply take an appeal from the district court's ultimate merits ruling and ask the court on that appeal to hold that the prior decision denying it leave to intervene had been erroneous. Counsel, we don't normally require parties to seek en banc review or seek cert before and forfeit rights at the expense of not doing so. I would hate to say the rule is you've got to seek cert and every time you want this type of thing to be applied. Well, I think what FASCN is essentially attempting to do here, at least in part, is to ask the court in this proceeding to rule on the question of whether it had a statutory right to intervene and whether it was wrongly denied a review. And if FASCN thinks that's the sort of issue that warrants this court's attention, then it should have sought this question directly. Well, I mean, maybe it doesn't think it warrants this court's attention because there's no split or the usual criteria that we have for cert, but I don't think it's part of an exhaustion requirement that you've got to seek en banc review and certiorari. That's pretty, I mean, I think that's unusual. Those remedies are strictly limited, may not at all be applicable to what is nonetheless a perfectly valid legal claim. Well, I think in general, if you have a court of appeals decision that comes out against you and you want the court in some future proceeding to kind of behave on the assumption that that decision was wrong, you really need to seek whatever form of review is available at that time rather than ask the court in the subsequent proceeding to hold that the former court got it wrong. What happens in a normal litigation, let's assume it's not an agency, there's a motion to intervene by a party, are they required to appeal? Yes, if they want to become parties, if they are denied intervention and they want to have the rights and obligations that go with party status in the underlying litigation, they would need to appeal from the denial of intervention. And if they lost there, they couldn't take an appeal from the merits judgment in the case and essentially ask for a second bite at the apple, ask the court of appeals in the merits appeal to revisit the question of whether intervention should be granted. We would never have any ending to litigation if the parties who want to intervene could come in at any point in time even after judgment raising new issues when they weren't parties below. Yes. Why shouldn't Fasken have been allowed to intervene? If this had been a civil proceeding, he certainly would have met the requirements for intervention, would he not? Yes. He would meet Rule 24, right? Yes. So why was he kept out of this? Basically because the commission, first the Atomic Safety and Licensing Board and then the commission found that Fasken had failed to raise a genuine issue of law or fact. And it's important to realize that the issues that Fasken was trying to raise as an intervener were very different from the one that is at issue now. Fasken was not arguing at that stage that the NRC lacked statutory authority to license off-site storage. It was making much more fact-specific environmental objections to the project. Is the state raising the issue it's raising today in any of the proceedings below? Not in the agency proceedings. It raised the statutory argument in the Court of Appeals, but not before the agency. And the state didn't even attempt to intervene in the agency licensing proceedings. And they have an absolute right to intervene. They don't have an absolute right to intervene. They have their more, I would say, forgiving or more hospitable standing requirements for the state. But the state still has to identify an admissible contention under the NRC's intervention rules. Would you say that one of the purposes of the party requirement in the Hobbs Act is to ensure that issues are raised before the agency? I would say that is a purpose. I would also have to concede that the purpose is achieved imperfectly because the Hobbs Act doesn't have what is sometimes referred to as an issue exhaustion requirement. That is, the Hobbs Act requires that you be a party, but at least under the terms of the statute, there is no requirement that, as a party, you raise the same issue that you want to raise in court. Mr. Stewart, I understand your argument to be that the party aggrieved language in the Hobbs Act is narrower than the person adversely affected language in the APA. Is that right? Yes. Would anything prohibit Fasken or Texas from bringing an APA challenge in district court as persons aggrieved? I think the exclusive review scheme of the Hobbs Act would do that, unless the court concluded for some reason that the Hobbs Act review scheme was inadequate and that the exclusivity of the Court of Appeals review scheme should be made an exception to for that reason. Okay. The ultra viris argument, perhaps, could be brought there, you think? I don't think ultra viris really maps on to what the court has looked to at least recently, because the ultra viris exception turns on kind of how bad is the agency error alleged to be or did it represent an exercise of authority that the agency doesn't have. Whether that is so or not doesn't really speak to the question whether the Hobbs Act review mechanism would be adequate to address the sort of error. If I may, I'd like to address the merits. If I could ask you one more, Mr. Stewart. I mean, I take your point that the issue before us is not whether there was proper intervention here, whether the intervention should have been given. But still, isn't it a little bit odd to say that the agency whose action is being challenged in court has so much control by virtue of its regulations on intervention to dictate who gets to challenge the action? Well, I think the agencies will always have some control. So, for instance, if you have to comply with agency rules in noticing comment proceedings in order to file suit in court, the agency may say, submit comments within 90 days and submit them to the following email address. And if you try to submit comments but they're untimely or they go to someone else, that may affect the court's review authority. The other thing I would say in this particular setting is there was an alternative route available for judicial review of the current statutory claim that didn't require intervention in the licensing proceedings. Fasken or Texas could have filed a petition for rulemaking and it could have asked under the Commission's rules that the licensing proceeding be held in abeyance. And that's not just a theoretical option. The papers on the merits are full of references to the D.C. Circuit's decision in Bull Creek, which about 20 years ago upheld the Commission's statutory authority to license offsite storage of spent nuclear fuel. And that was the procedural route that the state of Utah took to get to the D.C. Circuit. It filed a petition for rulemaking asking that the Commission rules that authorize offset storage be modified because they were inconsistent with the statute. The Commission denied that petition and Utah filed a petition for review of that denial in the D.C. Circuit. And they didn't get the merits outcome they wanted, but they got plenary judicial review of the merits question, did the Commission have the statutory authority that it claimed. Mr. Stewart, on the merits, I do have a question for you. So Yucca Mountain was supposed to be the permanent solution. Congress so ordained, I think it said it had to be done by 1998. No president has complied with that in all the years since. We've spent something like $15 billion on it. It's a hole in the ground. And parties seem to think the Yucca Mountain project is dead. And if that's true and there's no different permanent repository, how is this interim storage that the government is authorizing here in any meaningful sense? And especially when I think ISP's given a 40-year license, that doesn't sound very interim to me. It's renewable, too, apparently. It is renewable. If they applied for a renewal of the license, there would be a new Commission adjudication, and to the extent there were changed circumstances that cast doubt on the propriety of this arrangement, the Commission would be able to speak to that. I don't mean to seem glib, but the repository is intended to keep nuclear waste storage safely. On a concrete platform in the Permian Basin where we get our oil and gas from. So hopefully we won't have radiated oil and gas. And, of course, that was an objection that the State and FASCN made, but that's not the question that is before the Court today. The other point I would make about kind of who bears responsibility for the delay and what we should do about it is that the people who absolutely don't bear responsibility for the delay are people like ISP, private enterprises who are trying to come up with interim solutions to the nuclear waste storage dilemma. And it's not that the Commission decided itself that this facility would be located in West Texas. ISP came up with a proposal. It filed a license application. Even if the license is upheld, ISP will actually be able to store spent nuclear fuel only if it can work out contracts with the people who control the waste now and they work out what is, for both parties, an economically beneficial arrangement. And so the Commission's role is to decide whether this is safe and consistent with the statute. But the Respondent's position would place roadblocks in the way of people like ISP and people like those who currently control the nuclear waste trying to devise market-oriented solutions to the problem. Thank you, Counsel Justice Thomas. Mr. Stewart, I do think it's somewhat strange that the NRC gets to choose which parties are able to challenge it later on. But with that aside, what's your argument that the Nuclear Regulatory Commission has the authority to establish, to store nuclear waste off-site by a private party? Well, there are really, in a sense, five pertinent statutory provisions here. The relevant constituent parts of spent nuclear fuel are source material, special nuclear material, and by-product material. And for each of those constituents, there is a statutory provision that says the unlicensed receipt, use, or possession of this substance is illegal. But then for each of those, there's a cognate provision that says, but the Commission can issue a license for private storage if certain criteria are satisfied. And if the Commission issues a license for private storage of each of the three constituent parts, it can do it in the same license, and that adds up to a license to possess spent nuclear fuel. This is a permanent off-site by a private person, who is not a nuclear power plant, for example, but simply storage. It is not permanent. It is still interim. But yes, there are really three categories. There is at the site of an operating nuclear reactor, and then at the other extreme is a facility like ISPs, which would be at a location where no nuclear reactor has ever operated. And then there are also, we've counted, eight facilities where the Commission has licensed storage of spent nuclear fuel at locations where a nuclear reactor once operated, but where the reactor has been decommissioned. And in three of those instances, the NRC renewed the materials license after the facility's license for the reactor itself had expired. And so for relevant purposes, they seem to us similarly situated to the ISP facility. They are now standalone storage facilities, even though they are at locations where reactors once operated. Well, I mean, that's in part because the facility is closed down and the material is left where the facility used to be. But is there any comparative for a large amount, I forget how many metric tons we're talking about here, is transported to a separate private facility for virtually permanent storage? I guess the G.E. Morris facility is a standalone facility that's been in operation since, I think, around 1980 or before. So I don't think the volumes are the same as the ones that ISP contemplates. But the two things I would say are, first, the volume of waste in the United States is not going to change depending on whether licenses like these are granted. Granting license to possess the spent nuclear fuel in a storage facility is not going to increase the volume of nuclear waste. It's just going to change where in the country it would be stored. And with respect to permanence versus temporary status, there's no reason to think that if the court rules against us and the waste has to stay at the site of the decommissioned reactors, it will stay there for any shorter period of time. It's still going to stay somewhere until a permanent repository is opened up. And the third thing, and this goes to the point I was making before about market-based solutions and ISP's motivation. Part of the suboptimal character of continued storage at the decommissioned sites is that you have a bunch of places around the country that now serve no other purpose but to store spent nuclear fuel when once they were operating reactors. And clearly ISP and some of its potential contracting parties think that it would be better to centralize the fuel at one location so that the other locations could be returned to what's been referred to as greenfield status. They can be put to alternative uses. Justice Alito? Is there more security around facilities that are owned by the federal government than around these private facilities? I don't know the answer to that. I mean, certainly the commission in determining whether the licensee has met the requirements wants to verify that there will be what the commission views as adequate security arrangements. Suppose this is allowed and 40 years go by and then there's an application to renew the license. Would it be permanent at that time? Or what if it's renewed and it's another 40 years? It will never become permanent. It would still not be permanent. And again, you would have the same dilemma if the waste is left at the decommissioned nuclear reactor sites. That is, at some point the materials license will expire. The commission will have to decide whether a new license should be issued. We're going to confront that. Until a repository is made available, we're going to confront that dilemma at some locations within the country. It's just a question of where those locations will be. And the other point I would make about security at federal versus private, the decommissioned reactor sites I'm referring to are also private sites. They would be governed by the same arrangements that would govern ISP. Which statutory provision? I know you say a number of them. Which one do you think provides the strongest support for your argument? Well, I think I would say two things. First, I would point the court to the licensing provisions in the Atomic Energy Act, which are 42 U.S.C., 2073A, which deals with special nuclear material, 2093, which deals with source material, and 2111, which deals with byproduct material. And the commission from 1980 has regarded those, has had published regulations that treat those as authority to license private storage of spent nuclear fuel. The other thing I would point the court to in the Policy Act is that the Policy Act was enacted in 1982, two years after the commission's rules had been promulgated. Congress clearly expressed its approval of private storage, focusing on on-site storage, but it didn't create new licensing mechanisms for that to occur. Thank you, Mr. Stewart. One final question. 2073A refers to special nuclear material, not to spent nuclear waste, and special nuclear material has a specific, narrow definition. Yes, and there is also a provision, I think it's 22018, that says various authorizations can be combined in a single license, and the three constituent parts of spent nuclear fuel that require a license are special nuclear material, source material, and byproduct material. And so the commission has always believed that a license that covers each of those will be sufficient to cover spent nuclear fuel because there's nothing else that needs to be licensed. And then the other point I would make is, if that were not true, the commission would be equally unable to license on-site storage because these are the same provisions it relies on to license storage at the site of a nuclear reactor. Jesse Sotomayor? Counsel, the on-site storage requires security to watch this inner product, make sure that nobody breaks in. So what we're talking about is that there is a danger to the community by these inactive facilities holding on to the spent nuclear waste because the cost associated with the storage in terms of security is greater, isn't it? Yes, and that was one of the justifications that ISP gave, that it was more economical to have security for one centralized facility than to have separate security for different facilities around the country. 2201 basically authorizes the agency, quote, to establish by rule, regulation, or order such standards and instructions to govern the possession and use of special nuclear material, including all the byproduct materials, as the commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property. I look at that as the direct authorization to set forth the terms of possession and license, correct? Yes, and I think the commission was on solid ground when it promulgated the rules in 1980, but when Congress stepped in two years later and enacted some new provisions, but without disturbing the preexisting licensing scheme, that was an effective ratification. You know, I'm finding it curious that in a country that's celebrating its 250th year, that some of my colleagues think that 40 years can't be temporary. I hope that we make it another 250, but if it takes 40 or 80 years for a solution to come, it would still be temporary, correct? Yes, and as I say, whether you want to think of it as temporary or permanent or quasi-permanent, it's going to be the same length of time regardless of whether the waste is at an ISP facility or at the site of a decommissioned reactor. And in a time in which the danger to the community continues to exist. If we keep going on something that can't, if we keep permitting storage in facilities that have had to shut down. Yes, I mean, the Commission believes that its criteria can make storage at these facilities safe, but at the same time, the perception that the risk is not zero is what has led people to want a permanent repository. Thank you. Justice Kagan? Justice Gorsuch? I guess I'm struggling with that. I understand your argument before Congress acted at NWPA, but afterwards it specifically said that it declined to authorize any storage facility located away from the site of any civilian nuclear reactor and not owned by the federal government. That was its judgment about the security that would be required for this material. What it said was that nothing in the policy act itself authorized, encouraged, or required storage. Exactly, because it thought that these were the places that were going to be safest. That was Congress's judgment, whatever ours might be, and I would have thought that the more specific and more recent in time statute would govern over the general. Isn't that our usual interpretive understanding? I mean, certainly if the policy act had said off-site storage is prohibited or the Commission may not license off-site storage, that would trump the pre-existing authorization in the Atomic Energy Act. The Congress was very careful not to write the statute that way. It basically said, with respect to off-site storage, we will leave the law as it found it. It said nothing in the policy act itself. So your argument does hinge on the idea that Congress's later enacted and more specific statute didn't trump the pre-existing statute. It didn't trump it because there was no inconsistency. And if we disagree with that? If you read section 1155H, if you read it to be a prohibition on off-site storage of spent nuclear fuel, then yes, that would trump the Atomic Energy Act's authorization. But as I say, Congress was aware that the Commission had asserted this authority and regulations two years earlier, and it wrote the language very carefully. It's judgment about safety, not ours, controls. Yes. But Congress didn't explicitly endorse the existing rules, correct, as relevant here? It didn't endorse the practice of licensing off-site storage. It clearly endorsed the idea that on-site storage was not only permissible, but was to be encouraged. And so there are findings to the effect that the owners and operators of nuclear power plants shall be encouraged to use their existing storage capacity and expand their storage capacity. Federal officials are supposed to encourage that as well. But not only did Congress not bar off-site storage, it also didn't enact any new licensing provisions, or for that matter, any new prohibitions on unlicensed possession. And so Congress clearly contemplated that licensing would continue to be done under the pre-existing Atomic Energy Act provisions, and those provisions don't distinguish between on-site and off-site storage. But it still seems a little odd to pick up on Justice Gorsuch's questions that Congress would write that provision in 10155H in that way without something clear, because anyone reading that would think, okay, well, on-site storage or federal off-site are the two options that Congress is clearly contemplating in that 1982 Act. You know, the D.C. Circuit in Bull Creek did discuss the legislative history of this provision, and part of the history was prior versions of the bill would have encouraged off-site storage, and Congress wanted to make clear that it wasn't doing that. But I think even without looking to the history and just looking to the text, it's not conceivable that Congress would have chosen this language if its intent was to prohibit the Commission from doing something that it knew the Commission had just asserted the authority to do. It could have said nothing in this title, i.e., Title 42, which encompasses both the Atomic Energy Act and the Policy Act, shall be construed to authorize, require, or encourage. Instead, it limited that language to the Policy Act itself. The clear intent, we think, was to leave the Commission with its preexisting authority over off-site storage but not to expand it or affirmatively encourage it. And one more, the other side responds that the Atomic Energy Act itself does not expressly authorize private off-site storage. I just want to get your succinct answer to that. It doesn't speak in so many words of off-site or on-site, but it would be equally apt to say that the Atomic Energy Act doesn't expressly authorize on-site storage. That is, it says people can be authorized to receive and possess the following substances for the following purposes, which include a residual. But it doesn't talk about, in one way or another, about the location where that may occur. Thank you. Justice Barrett? Justice Jackson? I don't hear you disputing that Congress in the Policy Act was expressing its, perhaps, preference for on-site storage. But I guess the question is, how is that objective best accomplished? And it seems to me that Congress in this statute was doing so by incentivizing on-site storage, which appears to be a different thing than prohibiting off-site storage. Yes, I think that's right. And one of the ways it incentivized on-site storage was the federal storage program ultimately never got off the ground. But during the period when it was potentially in effect, one requirement that you needed to satisfy in order to have access to federal storage was show that on-site storage was not available. And there was no similar requirement with respect to off-site storage. So you could say, in that respect, Congress put a thumb on the scale in the direction of on-site storage. Encouraging people to do on-site. Yes. And I know sometimes the court is interested in clear statements. So to the extent that the agency had previously exerted its licensing authority in this way, would one have expected Congress to have made clearly a prohibition statement if it was attempting to preclude off-site storage?  Thank you. Thank you, counsel. Mr. Fagg. Thank you, Mr. Chief Justice, and may it please the court. With respect to the Hobbs Act, if you seek intervention under the agency's rules and that's denied, that's a final order you get to appeal. So I guess I would resist the notion a little bit that there's no judicial review of that. You do have to appeal that within 60 days. Faskin did to the D.C. Circuit. Like we talked about, that played out the way it did. Faskin did not appeal to the Fifth Circuit within 60 days. Did not appeal until six or seven months later. And I think that's a real problem with looking at what Faskin did at the agency to try to justify the Fifth Circuit's exercise of jurisdiction here. With respect to merits in the Atomic Energy Act, the primary argument of the respondents here is that the words spent nuclear fuel are not separately defined. If they're right, then the Atomic Energy Act does not prohibit the possession of spent nuclear fuel. My client, ISP, never needed a license if they're right. They could have just built this facility. With all due respect, I would suggest that's not a credible interpretation of the Atomic Energy Act. With respect to the Nuclear Waste Policy Act and the references to encouraging of on-site storage, I think it's important to understand the context in which those statements appear. Those are all in subpart B of the policy act. Subpart A, I would argue, is the guts of the act. That's the permanent repository underground for hundreds of thousands of years. Subpart B was a very limited, now expired program involving access to 1,900 MTUs of federal interim storage. And the context of that makes clear it's self-contained. If you look at the legislative history, it also sheds light on the fact that in the sausage-making of that bill, there was a lot of back and forth about whether the industry would have to exercise and exhaust off-site storage before they could access this 1,900 MTUs of federal storage. The industry didn't want that. Some legislators did want that. Some drafts required them to do that. But that context is how these references to a preference for on-site storage, which are only in subpart B, came to be. And I would respectfully suggest further confirm that it's error to say that there are location restrictions. Certainly no locational restrictions appear within the Atomic Energy Act. Well, could you give us a straightforward argument for the authorization for off-site storage at a private facility? It's under the Atomic Energy Act. It's 2201B. It's 2073, 2093. And so what would your argument be with those recitations? They authorize the NRC to license the possession and storage of the constituent spent nuclear fuel without any locational restriction. If you say on-site, you're reading a term into the Atomic Energy Act that is not there. So there's no language that you could use to say that spent fuel shall be or is permitted to be stored off-site. You're stitching together seeming just constituent parts, not just spent fuel. And I'm just looking at asking whether or not there's anything you can rely on that speaks to spent fuel in the aggregate being able to be stored off-site at a private facility. I do rely upon the three constituent elements adding up to spent fuel. In the same way, you have to rely upon the three constituent elements adding up to spent fuel to prohibit the possession of it. Because if you don't buy that proposition, you can't have one without the other. You can't say the Atomic Energy Act prohibits the possession of these three items, but it doesn't allow the licensing of these three items. It's either one or the other. And if the three constituent elements don't add up to spent nuclear fuel for licensing purposes, they can't add up to the prohibition on possession. And I go back to what I said earlier. My client never needed a license. We should have just built this thing. Why are we here? What you're saying, I think I understand, which is if you read the Act, it doesn't say you have to possess it where it's created. That is certainly true. There's nothing there that says possess in any particular place. I think that's true. And I think it's also important to keep in mind, there was always going to be spent nuclear fuel. Whether reprocessing played out the way people thought it was going to back in the 50s, 60s, 70s, whether Yucca had gotten up and running just like it was supposed to, you were always going to have spent nuclear fuel discharged from a reactor, stored for some period of time. Even if you're going to reprocess it, you've got to ship it off to a reprocessing site. And it still doesn't get rid of all of it. There's still something. It's not 100%. Even with reprocessing, there's still residual spent nuclear fuel left. So the notion that the Atomic Energy Act wasn't intended by Congress to cover all of those different parts of what might happen or not happen to spent nuclear fuel, again, I would suggest is not a credible interpretation of the Atomic Energy Act. With respect to sticking with the merits... Can I just ask you, is there any difference between your argument and the government's in this case? Substantively, I'm not aware of a difference. I think we articulate things a little bit differently, but no. Thank you. With respect to the Nuclear Waste Policy Act, I want to emphasize, because I think it's a really important fact, that the 10 CFR Part 72 regulations that were formally, after notice and comment of rulemaking, acted on and on the books at the time of the Nuclear Waste Policy Act. And this wasn't a sort of secret, in-the-pocket exercise of authority. Massive notice and comment over multiple years, a big, thick chunk of the Federal Register with all the comments, including debates about on-site versus off-site storage. Is it a good idea or a bad idea? Not a whisper of the notion that the Atomic Energy Act didn't cover storage of spent nuclear fuel on-site or off-site. And all that was enacted in 1980. All that was demonstrably known by Congress when it undertook the comprehensive Nuclear Waste Policy Act legislation, ultimately at the end of 1982 and 83. And so, to just underscore the fact that in discerning Congress's intent here with these two statutes, I would say that the chronology and the facts confirm that the Nuclear Waste Policy Act, considered with the Atomic Energy Act, underscores and supports our position. Meaning, given what was known, is what you're saying, I think, Congress would have explicitly prohibited private off-site had it wanted to do so. Is that what you're saying? Yes. Yes. And again, if you go back to what I referred to earlier, the limited sort of provisions within Subpart B, the access to the Federal Interim Storage Program, and 10155H that we talked about, nothing in this chapter shall authorize or encourage, I would suggest and again commend the Bull Creek decision, both at the agency level and the D.C. Circuit, for addressing the real role of that language. It wouldn't make sense if it was not already allowed to say nothing in this statute shall authorize or encourage. Because if it's not allowed, it's not allowed. And that's the position of respondents in this case. And so I think read in context, read correctly within the Nuclear Waste Policy Act and referring to the known documented history of the Atomic Energy Act, those provisions, again, support. What's the source I should go to to get the history you referred to earlier about the various drafts that were being fought on about in Subpart B? We cite a couple of them in our reply brief. And apologies, I don't have them handy here right now. But I would refer to our reply brief, and I would in particular refer to the agency's decision below, which we cite again in our reply brief, that goes through exhaustively that legislative history. We cite it in a footnote in our reply brief and refer to the specific footnotes within that agency decision that refer back to the various debates. There were draft bills. There was a lot. Thank you. Mr. Fagg, what do you say to your friends on the other side's argument that spent nuclear fuel is not simply the combination of source special nuclear and byproduct materials under the AEA, that it requires other things like it must have been withdrawn from the nuclear reactor, must have undergone reprocessing, not have undergone reprocessing. And that's reflected both in the statute in the NWPA and also in the NRC's own regulations. I think I would say factually it's just not the case that when you pull one of these spent nuclear fuel assemblies, which are 15-foot metal with all the uranium rods inside, that there's anything at all in there other than special nuclear material, source material, or byproduct material. There's metal sheets and things that hold this all together. They become irradiated through the exposure and the process, and that falls squarely within the definition of byproduct. I appreciate that, but spent nuclear fuel is defined in the later statute as being withdrawn from a reactor, which doesn't necessarily pertain to the three constituent parts, and it must not have undergone reprocessing. Those are two conditions, at least, that seem to me to differentiate the two, and I'm struggling for an answer. May I respond?  The answer to that, I guess I would say, is, well, which way does that cut? So when Congress added the definition of spent nuclear fuel in 1988, incorporating the five-year-old definition from the Nuclear Waste Policy Act, again, decades and decades and decades of practice have been treating the three constituent elements as spent nuclear fuel for purposes of prohibiting possession and licensing. So I think, again, just factually and looking at the statutory definitions of the three elements, a spent nuclear fuel assembly is those three and nothing else. Mrs. Thomas? Mrs. Alito? If Congress wanted to authorize temporary off-site storage of spent nuclear waste, why did it use the term special nuclear material? Well, special nuclear material is one of the three elements. Yeah, I understand that, but why choose just that? Why not refer to the whole thing? Well, in 1954, there wasn't yet a nuclear power plant. When the Atomic Energy Act was passed, the first online commercial plant wasn't going to come on until about 1958 or so. So I think that the logical and probable reason why Congress did this is to reduce it to the most pernicious, if you will, elements of it. So if you can't do it with special nuclear material, you can't do it with spent nuclear fuel. And so rather than, you know, there's all kinds of additional things that may or may not have these elements in them, but an efficient and effective way to safeguard the public health and safety, to promote, you know, all the things that the Atomic Energy Act was to promote was to do it the way it did it, which is reduce it to the minimal elements, if you will, and invest the agency with the authority under the provisions we talked about to regulate those. Would you agree that the state of Texas and those with an interest in the Permian Basin have a reasonable, that it's reasonable for them to be concerned about the storage in this location? I have no reason to doubt that they care. I question why they didn't intervene like lots of states do and like the regulations specifically allow. I would also observe, and it's in the record, Texas originally supported this project and then reversed itself and opposed it. But I don't doubt their... Well, why was this location chosen? You know, there's reams of environmental aspects of this, and one of the things is looking at, you know, the potential alternatives. And, you know, nobody close to a location chosen, including the nuclear plants in Oregon and New England, want it there or like it there. But, you know, it was a place that was deemed ultimately, after a lot of study, to have been somewhere where it could be safely stored. Do you have a prediction about when there might be a permanent storage facility? I've been in this stew for a lot of years, and there's a lot of... There are a lot of talks. There's a lot of energy. But I think I'd be... As I sit here today, I think, you know, I'd be kidding myself in the court if I said I have a date. But, you know, it's still the law of the land as we sit here today. If it is decided that material can be stored off-site temporarily, and temporary means more than 40 years, maybe more than 80 years, maybe it means 250 years, maybe it means 500 years, where is the incentive to go forward to do what Congress wanted to have done, which was to establish a permanent facility? Well, the incentive is what it is, whether the fuel is at the facility my client wants to build it or is scattered across 40, you know, sites all across the country. So, you know, the incentives... And, again, this is an industry that is harmed by DOE's failure. Trying to mitigate it through my client's actions and to sort of punish the industry doubly for DOE's failure and then not allow them to save tens of millions of dollars and mitigate, I would suggest is not furthering the incentives that we want in terms of a critical part of... a fifth of our nation's power. Justice Sotomayor? Justice Kagan? Justice Kavanaugh? Justice Jackson? Let me just ask you to speak quickly about the party issue. Does it matter whether the intervention motion was wrongly denied at this stage, at this point? In this case, I would say no, because that was all litigated at the D.C. Circuit level. It wasn't timely challenged in the Fifth Circuit level. Again, I resist the notion that there's no judicial review. If you're denied, and to echo something Mr. Government Counsel said, there's all kinds of ways you could say these rules are too restrictive. These rules are too much. You can challenge them in a proceeding, you can get a waiver to challenge them in a proceeding, or you could do, as in the Bull Creek proceedings and as Mr. Stewart pointed out, a petition for rulemaking. So that's kind of a long-winded way of saying it's not before this court in this case about whether Faskin's attempt to become a party was rightly or wrongly decided. The D.C. Circuit said it was rightly decided, and here we are. Thank you. Thank you, Counsel. Mr. Frederick? Thank you, Mr. Chief Justice, and may it please the Court. The 1982 Nuclear Waste Policy Act created a comprehensive program that addressed where and how to store spent nuclear fuel. That program does not include private off-site storage, which Congress specifically ruled out in Section 10155H. As the later enacted more specific act, the Policy Act controls, and the NRC cannot administratively override it. The Atomic Energy Act itself authorizes only on-site storage, not off-site storage. Sections 2133 and 2134 allow the Commission to impose conditions, including safety requirements, on utilization and production facilities licenses. Reactors are utilization facilities, so licenses cover on-site storage of spent fuel because that material is so hot it takes years to cool, and it can only be done safely on-site by removing the reactor core and moving it immediately into water. And that's why more than about 50 percent of all spent nuclear fuel is in cooling pools around the country. Section 2136, which is not cited in the briefs, says the NRC, quote, may define the various activities at each such facility. And we think that clearly means regulating the safety characteristics of dealing with spent nuclear fuel when it comes immediately out of the reactor core. The Commission's efforts to derive authority from the AEA's material license provisions don't work because storage is not use. As the 1982 Policy Act defines it, storage is, quote, retention for subsequent use, processing, or disposal. I welcome the Court's questions. Why are you a party now? We're a party now because under the plain language of the Atomic Energy Act 2339A1A, we are affected by the proceeding, we shall be admitted as a party, and we requested a hearing. And those are all indisputed facts. So what do we do with the D.C. Circuit opinion? I think what you say is that there were two purposes that FASCN wanted to advance as a party. One was to be able to intervene for the purposes of putting in expert testimony and other facts. We were denied that, Justice Thomas, and we're not appealing that now. But the second purpose, which is satisfied by the plain language of the Atomic Energy Act, is to be able to challenge that the NRC approve this license without statutory authority. And the NRC's intervention rules, which are set forth at 2.309 and 2.335, make it very clear that the NRC itself is going to serve as a gatekeeper and does not allow parties to come in and challenge their statutory authority in the licensing proceeding itself. But why isn't this a collateral attack on the intervention decision? I guess I don't understand. Because as I said, Justice Jackson, the intervention which we sought was to be able to put in expert testimony and to participate in what was effectively a proceeding to gather evidence. Here we're bringing a pure legal facial challenge, and we really... Mr. Frederick, it makes no sense to me. What you're saying is instead of bringing that argument to the agency first, you get at any point in time that you want to the right to intervene and argue that they don't have the power. Don't you think the normal course of agency proceeding, and we've already said that even though agencies sometimes can't decide constitutional questions, there's no question that the agency could have listened to the argument that it statutorily wasn't empowered to do so? Except that their rules say you can't. And so it would have been utterly futile to go to the commission and say, you're acting ultra vires beyond your statutory authority because the regulations of the NRC say we are not going to accept that contention. And then you could have brought it to the Fifth Circuit. That's what we did. We did argue it. Yeah, but you didn't argue it at the time when you didn't bring it. You didn't argue it at the time that you moved to intervene. That's incorrect. Did you say... I would like to set the record straight. Go ahead. Yeah. We moved to dismiss. Very first motion we filed said this is not within your statutory authority. We moved to intervene for multiple purposes. And then you didn't take it up to the Fifth Circuit. We argued to the Fifth Circuit that the... At the second... Because that was the final order, Your Honor. We challenged the final order as being outside the scope of the authority... But you didn't do it at the first motion. No, because the first motion only went to could we intervene for purposes of bringing in evidence to the commission. And the point here is are you going to allow agencies to manipulate their rules so that they can decide who gets challenged...  Quite frankly, I'm worried about party manipulation. I'm trying to understand what basis you now have to say that we should be revisiting the D.C. Circuit's determination that you cannot intervene. I'm not asking you to do that.  So if we believe that the law is such that you had to be a party, do you concede that you were not a party at the lower court proceeding? No. You do not. We do not concede that. And the basis for your party participation is what? The Atomic Energy Act says that if we are affected by the proceedings and we ask for a hearing, the NRC, quote, shall admit us as a party. That says, Mr. Frederick, why you have an argument that you should have been a party. And maybe you do have a good argument that you should have been a party. But it's not to say that you were a party. In fact, you were not a party. No, I think that we were not a party in the sense that we were permitted to do the full evidentiary exposition that we might have liked to have done. And I'm not arguing that we should have, that that should be revisited. But we are a party under the meaning, the plain language of the Atomic Energy Act, which says we shall be a party and we shall have an opportunity to say in a judicial review setting. I mean, you know, when I look at this, your only participation in the agency proceeding was to be excluded from it. But then you're saying, well, if I was excluded wrongly, I'm a party. I mean, how could that be? I mean, that's very much against the way we think of this in a judicial context, right, where we look at somebody and they've tried to intervene. And maybe they've been wrong. Maybe the court was wrong to say that they can't intervene. But we don't say, oh, the court was wrong. They really should have been there. And so we're going to give them an opportunity to come in at some later point in time and attack the judgment. It just doesn't work that way. Well, I would say this is not the normal agency proceeding. The Pacific Legal Foundation says that they have looked at the various agencies. This is the only agency that serves as a gatekeeper to its own proceedings. That's point one. Point two, there are different scopes of party participation. One is that you participate as a full party, bring depositions, bring other evidence. That is not what we are challenging here. What we are saying is that the plain language of the Act gives us the right to say for the first time in court, because the agency won't allow us to say it in the proceedings, you don't have the statutory authority for what you did. So, Mr. Frederick, if we disagree with you, if we think that as a matter of law, what counts as being a party is having the level of participation that you called Category 1, do you concede that you did not have that in this case? Well, we were foreclosed from having it. All right. So if we think that in order to be a party for the purpose of the Hobbs Act, you have to have that status, what difference does it make what arguments you're making or whatever? You didn't have that status. Because the Hobbs Act itself incorporates the Atomic Energy 2339 provision that I quoted to you about being a person affected by the license, requesting a hearing, that we shall be admitted. So the Hobbs Act... Did you make that argument before the court in your intervention? Wasn't that the basis by which you went to the court and said, I need to intervene, look at the Hobbs Act provision that says these things? No. What we did in the D.C. Circuit was we talked, and the D.C. Circuit, by the way... I'm sorry, that's not the statutory basis for your claiming the right to intervene? It is. It was, right? So you said to the court, look at the Hobbs Act, here are these criteria we need to be able to intervene, and the court disagreed. I think you're misreading what happened in the D.C. Circuit, Your Honor, with respect. We didn't have an opportunity to challenge the final order in the D.C. Circuit. That could only be done after the final order was made. So what we did challenge was the limited application of the commission's intervention rules to say they had not been applied correctly. Mr. Frederick, it makes little sense. The rule at issue that you wanted to intervene in was a rule that was citing a storage area that you now say they didn't have the authority to do. So if you were an agreed person under the Act, you could have gone to the D.C. Circuit on your first round of appeal and said just that. I can intervene because I have an argument that they've exceeded their statutory authority. And the D.C. Circuit 20 years before had rejected that argument? There was no circuit? So then you could have served here. You don't have to, but the Hobbs Act requires you to be a party agreed, not a person. Let me just say, Justice Sotomayor, if the court adopts that line of reasoning, the NRC is effectively immune from judicial review. Because they set the rules for determining what can be a, quote, admissible contention, which has to meet, surpass the summary judgment standard. Well, I think that point, Mr. Frederick, and it might very well be that this D.C. Circuit decision is wrong. I mean, it looks to me as though it goes beyond the statute. So I'm pretty sympathetic to that view. And yet I'm still sort of hung up on the idea that in this proceeding, at this moment in time, that's not before us. Only whether you were a party is before us. And any way I sort of think about it, you weren't a party. Well, I would ask you to reread the language of 2339 of the Atomic Energy Act, which says we are a party. And if you're going to apply normal textual canons of strict construction, you would say we are a party. I think that language says you should have been included as a party. I think that language gives you a good reason for saying that regulation is invalid and a good reason for saying that the D.C. Circuit is wrong. But I don't think that language gives you a good reason for sort of just, you know, making X not X, that you weren't there. Your Honor, I don't think that the Fifth Circuit's ruling that we were a party that should be allowed to challenge the statutory authority of the agency would deny us party status now. And I do want to emphasize the time point. As Justice Alito pointed out, this license can have this storage for up to 80 years. And under the reasoning of that line, no one would ever be able to say, well, you know, that nuclear stuff in the West Texas area was done illegally because no one had the appropriate party status because the intervention rules of the NRC said you don't get to intervene. That would be a very crazy way to think about limitations on agency authority that exceed what the statute allows. And I think that if you consider the other side's argument, on-site storage has to be done for safety reasons. The nuclear material that is burned, it is very, very hot. It has to stay on-site. And that's why the facilities license provisions are the easiest way to understand the practical reality that for 70 years this material has stayed on-site when Congress considered in the policy act what to do with it. You said over and over that it's hot and it's hard and all of that. But I would assume that in 70 years technology changes, that, you know, things happen and people figure out ways to store and move. What do we do with that? Well, the technology hasn't speeded up the cooling process of material that is radioactive. I understand, but we have ISP here saying that they can receive this material. This material, Justice Jackson, is so hot when it comes out of the core, no human being can get anywhere close to it. Which is why the design of the facility that is done by the commission is to have the spent rods taken down into pools of water. I'm not fully understanding why it matters that the material is so hot and that it's difficult to do in a situation like this in which the commission has apparently licensed, that's what you're challenging, this transfer. So someone thinks it can be done because they've given a license to do it. And it hadn't been done before this situation. The more facility, no facility has ever been constructed, the more facility that Mr. Stewart adverts to. But why doesn't that fit into the statutory authorization for the commission to make the determination about whether or not this can be done consistent with safety, etc., etc.? The policy act says in five provisions the NRC shall maximize on-site storage. It shall increase technology for on-site storage. It shall, if it has to go off-site, go to a federal facility. And does it say it cannot? Yes. It cannot authorize off-site storage. 10155H says it shall not do private off-site storage. 10155H. Yes. And I think, Justice Jackson, what's very clear from these provisions is that the NRC is seeking to use a rulemaking to override a statute. Thank you, counsel. Justice Thomas? Justice Alito? Perhaps in reply I'll get an answer to this so you can. I had understood that the cooling pools, that many of them are off-site. No. That's not correct. Right. And I misunderstood. And I can point you to the blue... I thought Mr. Fagg has said that. Right. There was a Blue Ribbon Commission report that the President's Blue Ribbon Commission put together that goes through all of this material. It goes through the nuclear process, the history of the storage site. It was published, I think, in 2012 or 2013. It answers many of the questions about the practicalities of the nuclear process. Thank you. Justice Kagan? Justice Gorsuch? A couple quick questions, Mr. Frederick. First, with respect to your Ultra Viras argument, it sure sounds to me a lot like an APA challenge beyond statutory authority that would normally be brought in district court in the first instance. Help me with that. Well, what I would say is that we have not found a case on all fours with the one that we have where the Ultra Viras argument was brought directly to the Court of Appeals. What I would say is that the jurisdiction, the exclusive jurisdiction provision of the Hobbs Act 2342 for... I understand. If you get in the Hobbs Act, you're in the Hobbs Act. But assume we're not in the Hobbs Act. Right. But what I'm saying is that 2342 says all final orders, the exclusive jurisdiction, shall be in the Courts of Appeals. And so our reading of that is that that answers the question of where you can bring the argument. It doesn't say how or what the argument is. I follow you. And then with respect to the struggle over the D.C. Circuit order, I didn't see anything in the opinion addressing the statutory question. And I didn't see anybody below arguing that normally for issue preclusion to have an effect, you have to have a ruling on the question at hand. Correct. And somebody has the burden to show that it applies. And I didn't see either ruling on this question in the D.C. Circuit. That's correct. And I didn't see the government or ISP suggesting that you were precluded as a matter of collateral estoppel. That's correct. They've not made that oral waiver argument. And that's why it's important to understand the difference between an intervener party and just a party to be able to say under the plain language of the Act, you've violated the Act. You've gone beyond the Act in approving this license. Justice Kavanaugh? One of the arguments on the other side is the Commission's interpreted the statutory scheme the same way for five decades, and that that consistent longstanding interpretation has itself significant weight as we interpret the statute. Do you want to respond to that? Yes. Thank you for asking that question, Justice Kavanaugh. If you look at the Federal Register for the 1980 rules, there are two paragraphs on the question of does the agency have the authority to do off-site storage. One paragraph says many commenters think it's a bad idea to do it anywhere but on-site. The second paragraph says some commentators think that it's okay to do it off-site. So we think we should have the authority to choose. They don't cite any provisions of the Atomic Energy Act. They don't ground that policy in any particular statutory language. It was the Commission's decision to do this simply on the basis of what they thought was a good idea. And then two years later, when Congress comprehensively addressed the subject in the Policy Act, the agency should have gone back and redone its rules. It didn't do that. And that's why Mr. Stewart has to make a rather convoluted statutory argument deriving from these provisions in the Atomic Energy Act. Is it really that convoluted? It's basically that the Act was understood to authorize this, that the Commission recognized that authority that Congress in 1982 had a chance to, was well aware of this issue, and did not expressly preclude this, and then that's been the way it's been for, you know, 50 years? Well, it is not how it has been. The only example they have is a former reprocessing facility. That is a production facility as defined in the Atomic Energy Act. That's the Morris plant. When reprocessing failed, they had to do something with the spent nuclear fuel that had been sent to the Morris plant. And so what they did was a kind of a jerry-rigged approach and said, it's here, we don't want to move it, let's just keep it here and we'll store it on site. And that has become the exemplar of their longstanding interpretation for offsite storage. It is really a stretch and makes no relation to the statutory text at all. One of the reasons longstanding interpretations matter, of course, is that private parties rely on those. In the amicus brief, for example, the Nuclear Energy Institute makes clear that a lot of investment has happened based on what appeared to be a settled understanding of the authority. You want to respond to that? Yeah, there's been no actual construction of an offsite facility, ever. There have only been three approvals. One, the Bull Creek example, was never built. So that license was approved, no facility. The only two other ones are before this court. That's Holtec in New Mexico, ISP in Texas. And then last question. Petitioner's counsel said if your statutory argument is correct, they never needed a license to begin with. You want to respond to that? Yeah, what I started with on the facilities license is that in order to ensure the safe operation of the facility, under 2133, 2134, and 2136, the commission has always asserted the authority to make sure safe operations occur on site. But that's part of the facilities license, which means you don't move it off the facility, which is the whole argument that they're trying to make here by saying it's lawful to take what is a materials license and contort what authority that they were really asserting under the facilities license provision. Thank you. Justice Barrett? Justice Jackson? Do you concede that the party-agreed language is jurisdictional? I think that if it's jurisdictional, it can't be waived, and so... No, I understand. I'm just asking you, is it a jurisdictional provision? I'm not sure. I think courts of appeals have treated the 60-day provision as jurisdictional for appeal. I'm not sure that they've treated who constitutes a party as being jurisdictional. But what I would say to that, Justice Jackson, is that in all of those Hobbs Act conditions, you should look at the organic statute for the commission first, because the FCC has two different appellate mechanisms. One is a Hobbs Act provision, and the other is not Hobbs Act. I'm just trying to understand the argument that I think you're now making, which is that there's a difference between being an intervener party for the purpose of any party aggrieved and being a party who wants to make the particular claim of ultra-virus. You say you're the latter, but you admit you're not the former. Well, I think we were the former. You didn't get intervener status. I'm not challenging that, Justice Jackson, but I'm not saying we're not aggrieved. We clearly are aggrieved, and we are aggrieved under any rule. I didn't ask you whether you were aggrieved. I'm trying to figure out whether you're a party. And the distinction that you've now made is the difference between parties who were interveners and parties who would like to claim ultra-virus. I don't see any statutory basis for that distinction, but I'm just trying to even understand where it comes from. What I'm saying, Justice Jackson, is there are two routes for us to assert our party status. One is under the Atomic Energy Act, which we clearly satisfy. The other is under the commission's rules for intervention, which the commission ruled against us on. I acknowledge we lost the second one, and it's not before this court, but that doesn't mean we don't satisfy the statutory requirements that would... Thank you. I understand your argument. Thank you, counsel. Mr. Nielsen? Mr. Chief Justice, and may it please the court, I hope to make several additional points, but I want to start with three quick ones. First, Justice Kavanaugh was right in PDR Network that the Hobbs Act covers a wide variety of orders. Under Clark v. Martinez, where one provision has multiple applications, the court applies a lowest common denominator interpretation to all of them. Even in the D.C. Circuit, if you file comments, that's enough to challenge a rule and a declaratory ruling and adjudication. Second, Congress added to the AEA the NWPA's definition of spent nuclear fuel. The court needs to interpret today's AEA and address Petitioner's obvious superfluity. And finally, if anyone thinks this is temporary, I have a bridge to sell you. There's no way that we're going to move 140,000 tons of nuclear waste in 60 years. What the commission has just done is put a permanent terrorist bullseye on the most productive oil field in America. I welcome the court's questions. You did not intervene. So why are you apparting now? Correct, Your Honor. So, I mean, effectively we did intervene, but I would say this goes back to understanding of the Hobbs Act. The Hobbs Act does not just apply to this agency. It applies to a whole bunch of agencies and a whole bunch of different types of orders. So if you file a comment in an FCC rulemaking, you're good. Or even in the D.C. Circuit, if you file a declaratory ruling, which is a form of adjudication, you discussed this in McKesson, that's also enough to file a comment. So that's what Texas did here, and I think it's important to understand kind of what happened. Yes. I mean, this was an adjudicatory proceeding, so the way people understand who parties are in an adjudicative proceeding, it's not enough to send in a letter. Well, a couple of responses. One, so is a declaratory ruling, and in the D.C. Circuit, declaratory rulings, it's enough to send a comment. So their distinction doesn't work on its own terms. And I would point the Court there to Petition Appendix 18A. That's where the Fifth Circuit discusses the D.C. Circuit precedent on that point. But second, this is a very strange type of adjudication. By statute, Congress has said that if they're going to do this type of license, they need to open up to NIFA, which is a notice and comment process, in the middle of the adjudication. This is not a normal adjudication. Do you think it's enough for anybody to send in a letter, or does it have to be the governor of a state? I think it certainly helps that it was the governor of a state. Well, I don't see really how it does help under the statute. I mean, it's nice that he was the governor of the state, but I don't see how you can make a legal argument on that basis. If somebody is a party, by virtue of sending in a letter under this statutory scheme, anybody is a party by virtue of sending in a letter. So, again, we think that if you file a comment, it's comments, it's part of the notice and comment process, but if they solicit you, which is what happened here, I point the court to the record on this one, this was J.A. 292, they asked us, they solicited our comments, and then we responded to that. Even under their best case, this water transport case from the D.C. Circuit that they rely on, if the agency solicits your participation and you respond to that, that counts. In the D.C. Circuit's, their case, again, that's their best case. So this isn't an ordinary enforcement action or something like that. Even then, I don't think their argument holds up. I mean, the question, in general, is what does party mean? And it seems to me party means somebody who has participated in an agency proceeding with the degree of formality required for that proceeding. So if you're in a rulemaking, being a party may very well mean I submitted a comment in a notice and comment process. But that's not the degree of formality that's associated with a proceeding of this kind. And, you know, you didn't intervene, you didn't even try to intervene, unlike Mr. Frederick's client. I don't see how we can say that you were a party. Well, I mean, the word party, it's the same word in the Hobbs Act that applies to all of these things. So we have to say the word party is a chameleon. It's not a chameleon. It's like different proceedings might understand who parties are differently. I mean, that's not anything weird. There are 3 separate processes, and the way you participate in those 3 separate processes are different because different rules apply, because the processes are understood. Parties in adjudications are different from parties in rulemakings. Okay, so I guess a couple of responses. One, I don't agree under the Hobbs Act that you're going to distinguish. It's one word that has to apply to both. But say I'm wrong about that. It is one word. It means have you participated with the degree of formality that's necessary for the kind of proceeding it is? And if you are, you're a party. It's one definition. Okay, so say I'm wrong about it. So I'm agreeing with you for purposes of this answer. I would still say what we're talking about here is a lot closer to a hybrid between a rulemaking and an adjudication than a pure adjudication. This is a licensing which Congress said, by statute, they have to take our comments. And then we filed those comments in response. And the argument that we are making today was presented to the agency by Sierra Club, and the agency said, no, we're not going to even consider that. We're not going to take that contention. So we're in a position here where they've asked for our comments. We've responded to their comments. The arguments we want to make, we've already said they're not going to hear. It seems very strange to say that the state of Texas is not a party. We're obviously agreed. And by their own regulations, they asked for our participation, and we participated. Are you defending the Fifth Circuit's ultra-virus holding? Are you saying even if you weren't, the party agreed, we could hear your appeal under the theory of ultra-virus? I didn't see you or Faskin spending a whole lot of ink on that in your briefs. I think the more straightforward point is that we are a party under the Hobbs Act, or if not, Faskin's truly a party, and this is all academic for us. So you're not. No, I certainly am. I certainly am, and here's why. If I am wrong about the Hobbs Act, then we really are in a situation where we don't have meaningful judicial review. If they can really cut us out by saying we're not going to take your contention because we think you're wrong on the merits, and that's somehow okay, then we are in the world of ultra-virus review. I don't think we're there. That's why our front-line answer is just look to the Hobbs Act. Did you move to intervene? Was something precluding the state of Texas from moving to intervene in this case? Other than they asked for our participation. No, I understand. I understand what you actually did. I'm just saying you say there's no meaningful judicial review, and I'm just wondering if there's an avenue for you to become a party with the requisite degree of formality, say, by requesting intervention. Was there a reason why you couldn't have done that? Yeah, so I would go back to what Mr. Stewart said earlier, which is even for states, you have to have an admissible contention, and the argument that we were making was the exact same argument Sierra Club made, and they said it's not an admissible contention. I would point the court to 10 CFR 2.335, which is their procedure. If they want to screen out these types of things, which essentially says if you think you're operating outside of... If we're operating outside of the law, well, then you have to file a petition for rulemaking. That is not meaningful judicial review. That is not how judicial review works. General, I take your point that if this were rulemaking, you'd be a party. I get that. I also understand the instinct that adjudications are sometimes different, though I know this court has held that objecting shareholders in a class action suit are parties for purposes of appeal, even though they haven't intervened. Where should we look to understand what the Hobbs Act meant by the term party? Sure. I mean, one, I would say, let's look at the dictionary. Both parties point the court to the 1951 Black's Law Dictionary. Look at the big text, not the little text underneath it. That's what they rely on. Look at the big front-line text that he uses in the 1951 Black's Law Dictionary. I would say there. But I'd also say whatever you say party means for Hobbs Act purposes, it has to be big enough to include rulemaking because it's the very same word. Yeah, we've never said that you have to intervene to be a party, and that was not the case in common law. Correct, Your Honor. And I'd also, again, this is back on the Tenth Circuit days, you run a decision, In re Wolseley, where the court... I thought it was a wonderful opinion. And the court explained... I wish I could remember it. The court explained the Clark v. Martinez point, which it says, tied to the rule of law itself. You can't have a word that means different things in different applications. If it's the same word, it means the same thing. You have to have the lowest common denominator to capture them all. But if I may, I'd like to turn to the merits, though I'm happy to keep discussing jurisdiction. I think that, for me, the most kind of straightforward way to understand the problem with their argument is Congress amended the statute. Congress amended the statute and took the definition of spent nuclear fuel from the Nuclear Waste Policy Act and placed it in the AEA. So there are provisions of the AEA that make no sense at all under their interpretation. I'd point the court to 42 U.S.C. 2210I, which lists all of these terms in the same sentence. So if spent nuclear fuel is just the same thing as the other three constituent parts, that sentence is nonsense. That cannot possibly be the correct reading of the statute. I would also point to the court, if I may, to where did Congress say they didn't want this? One is 10155H, which we've been talking about, which is inexplicable under their theory. But also 10131A3, where Congress said in its findings, paraphrasing here, we are unhappy with what has happened before. You don't see that very often from Congress, but Congress said we are displeased with what has happened before. And then you go on to 115H which says keep it on site. If spent nuclear fuel is not the same as the three constituent parts, why did ISP need a license at all? I think this is where a couple answers. One, I agree with Mr. Frederick that the answer is the licensing of the facility. You have to have a safe facility, so you have to have some way to keep the very, very, very hot nuclear waste safe. But the other is physics. If you have a license to take some sort of product or material onto a facility and you have a license to use that facility, but you have no license to take it off the facility, per Newton, it stays where it is. No, I'm just asking about the statutory possession requirement. I thought you had to have a license to possess this kind of material and it's the constituent parts and everybody has believed that that equals spent nuclear fuel. If you're saying that spent nuclear fuel is something different, then isn't it outside of all of this licensing? No, Your Honor. And I point the court back to Pacific Gas. Also, the first line of ISP's brief and the first line of Paul Clement's brief. The way you start with nuclear power going back to 1946 is right after Hiroshima. There's a federal monopoly on all of this. No private ownership of any of this stuff. Congress then, in 1954, opens it up for the first time and says, we're going to allow some private ownership or possession of these things and said, these are the three types of things that we are going to allow. They did not allow spent nuclear fuel. So if you start with the baseline of there's a federal monopoly and no one can do any of this and then you have three exceptions, you can't have a fourth exception. What about the idea that the 1954 Act arguably authorizes this? When you get to 1980, the commission says it does. 1982, Congress is very aware of this issue and certainly aware of where the commission is on this and yet does not preclude it and that's remained the settled understanding ever since. The basic same argument I asked Mr. Frederick. But that seems kind of unusual step by Congress that they might not have had the votes to prohibit it in 1982 might be one interpretation, big picture interpretation of what happened there. You just want to respond to all that? Sure. So one, again, I would point the court to 1155H and 113182. 1155H does not prohibit. Okay. But it is inexplicable under their view. But I would also point the court to the congressional brief where they explain the early statements of the agency after the passage of the policy act which I don't think are consistent with what we're hearing now. There's also the time. What strikes me is if we've always had this power then why wasn't it until after the agency gave up on Yucca Mountain that suddenly you started getting these applications. It's very bizarre it seems to me that if there's always been this power and there's still this power exists it wasn't until the agency said oh actually we're not going to do Yucca Mountain that suddenly said oh let's go back to this power that's already existed. Because it was told it had to try everything else. It was told in the 1982 act that it wanted to encourage on site the federal government to take it etc. So it couldn't run to do something that Congress said try everything else. And the fallback We've run out of everything else. I disagree with that Your Honor. But the fallback that Congress said was federal facilities. Federal facilities. And this goes back to the point that I think Justice Alito was making. What are the incentives for Congress here? If New Mexico and Texas are left holding the bag every other state will be happy. They will be pleased because this waste will stay in Texas forever. The only way we're going to get a national solution to this problem is by Congress to get everybody there and figure it out. They tried to do that with the Yucca Mountain and it didn't work. But the answer isn't well I guess put it on Texas now. No. Congress needs to go back and fix the law. If the law is broken it's on Congress. Congress will fix it. It's not this court's job. It's not the agency's job. Thank you. My time has expired. Mr. Thomas. Mrs. Alito. Justice O'Neill. When are we in the business of giving Congress incentives? No. Congress gave the agency incentives. Congress said do this. Thank you counsel. Justice Gorsuch.  In your opening you used the phrase terrorist bullseye which is obviously distinct language. We've known of that at least since September 11, 2001 yet Texas supported this project as I understand it. Correct me if I'm wrong.       Can you explain that if it was a terrorist bullseye? I would like to correct it. I urge the court to go back and look at J.A. 1-3 the very first pages of the J.A. This is Governor Perry's letter. I don't read that letter as saying this is a great idea. He is saying the federal government has failed its obligations and has not done what Congress said. You're not going to have an answer for this for decades and now Texas is in the spot of what are we supposed to do? They're going to build it across the border in New Mexico. Texas needs to have some sort of ability to have some say in this. That is how I would urge the court to read pages 1-3 of the J.A. That is not a ringing endorsement by Governor Perry. He was just going to say this is the best of the bad options. Governor Abbott comes in before this license and he says no, essentially over my dead body are you going to do this citing the terrorist concerns that we are identifying. Also look at the brief from the congressional brief which does this as well. Thank you. Justice Jackson? Thank you, Counsel. Mr. Stewart? Thank you, Mr. Chief Justice. Just a few quick points. First, Mr. Frederick referred to 42 U.S.C. 2239A which refers to deals with the commission adjudications. But that provision doesn't say if a person satisfies certain requirements that person becomes a party or is a party. What it says is under certain circumstances the commission quote shall admit any such person as a party to such proceedings. It's a directive to the commission. And it's indisputable here that the commission didn't admit either Texas or ISP as a party. I'm sorry, Fasken or Texas as a party. Fasken's argument is simply that it should have been admitted. Second, Mr. Frederick said that when spent nuclear fuel comes out of the reactor it's too hot to handle or too hot to move. And there is an initial period of at least five years when it has to be placed in a pool and I'm told that it's rare though not unprecedented that the pool is moved but after that time even when the waste is stored at the site of a nuclear reactor it's often moved into cask storage. It's in the same containers where it would be stored at ISP's facility. Third, Mr. Frederick referred to the 1980 Federal Register notice. There was a two-paragraph discussion I think it's heading number 18 off-site versus on-site storage. But it was all about policy. Some commenters said on-site storage is better as a policy matter. Some commenters said off-site storage is better as a policy matter. No commenter at that time questioned the Commission's statutory authority to choose one or the other or both and the Commission chose both. The next thing I'd refer to is there was a reference to the facilities license that Justice Kavanaugh I think you asked how would the ISP facility be illegal if your view of the materials licensing provisions is correct and the answer was they would still need a facilities license. That's not correct. The facilities licensing provisions apply only to production or utilization facilities. If you operate a nuclear reactor you need both a facilities license to operate the reactor and a materials license to possess the relevant stuff. But an ISP's proposed facility is not either a production or utilization facility. All it needs is the materials license. And it's true that in determining whether to grant the materials license the Commission will examine the nature of the facility. Is it safe? Is it secure? But that doesn't convert it into a facilities license. And Justice Kavanaugh you laid out the sequence of events that led to the current understanding or the until recent understanding that offsite storage is permissible and I'd add only one and that's the D.C. Circuit's decision in Bull Creek which was a little over 20 years ago and that was when the question whether the Policy Act had superseded the Atomic Energy Act's licensing provisions and precluded offsite storage. It was teed up then and the D.C. Circuit decided that no the Commission's offsite licensing authority remained intact and we've been another 20 years since then. Thank you. Thank you Counsel. The case is submitted.